IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF GEORGIA
MACON DIVISION

| | | |
|---|---|---|
| **KENNETH L RAINWATER,** | : | |
| Plaintiff, | : | |
| v. | : | No. 5:16-cv-00061-MTT-CHW |
| **CAROLYN W. COLVIN,** | : | Social Security Appeal |
| **Acting Commissioner of Social Security,** | : | |
| Defendant. | : | |

## REPORT AND RECOMMENDATION

This is a review of a final decision of the Commissioner of Social Security denying Plaintiff Kenneth L Rainwater's application for benefits. 42 U.S.C. Section 405(g). Because substantial evidence supports the Commissioner's decision, it is **RECOMMENDED** that this case be **AFFIRMED.**

## BACKGROUND

Plaintiff Kenneth L Rainwater filed an application for Disability benefits on June 16, 2009 (R. 77), alleging disability since March 5, 2000, due to limitations related to diabetes, depression, emotional illness, obsessive-compulsive disorder, borderline glaucoma, retinopathy, borderline personality disorder, tingling in the hands and feet, heart rhythm, high blood pressure, and high cholesterol. (R. 130, 156). It was determined that Plaintiff suffers from essential hypertension, anxiety related disorders, diabetes mellitus, and affective and mood disorders, but his claim was denied initially and on reconsideration. (R. 77-78). A Hearing was held in front of Carol G. Moore, an administrative law judge (ALJ), on August 10, 2010. (R. 23). The ALJ issued a decision denying Plaintiff's application on October September 2, 2010, (R. 1103), which

1

the Administrative Appeals Council declined to review on June 20, 2012. (R. 1). Plaintiff filed notice of appeal with Court and the decision of the Commissioner was remanded with instructions for the ALJ to "articulate her reasons for discounting the VA rating and Dr. David Nichols' medical opinion." (R. 1076).

On remand, a second hearing was held by Carol Moore on April 29, 2014, (R. 850), and a supplemental hearing was held on November 7, 2014. (R. 981). The ALJ denied Plaintiff's claim on May 26, 2015. (R. 842). The Appeals Council declined to review the decision on December 15, 2015. (R. 809). Plaintiff now appeals to this Court for a second time.

## STANDARD OF REVIEW

Judicial review of a decision of the Commissioner of Social Security is limited to a determination of whether that decision is supported by substantial evidence, as well as whether the Commissioner applied the correct legal standards. *Winschel v. Comm'r of Soc. Sec.*, 631 F.3d 1176, 1178 (11th Cir. 2011). "Substantial evidence" is defined as "more than a scintilla," and as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Id.* The Eleventh Circuit has explained that reviewing courts may not decide the facts anew, reweigh the evidence, or substitute their judgment for that of the Commissioner. *Id.* Rather, if the Commissioner's decision is supported by substantial evidence, that decision must be affirmed even if the evidence preponderates against it.

## EVALUATION OF DISABILITY

Social Security claimants are "disabled" if they are unable to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months. 42 U.S.C. § 423(d)(1)(A).

The Social Security Regulations outline a five-step sequential evaluation process for determining whether a claimant is disabled: "(1) whether the claimant is currently engaged in substantial gainful activity; (2) whether the claimant has a severe impairment or combination of impairments; (3) whether the impairment meets or equals the severity of the specified impairments in the Listing of impairments; (4) based on a residual functional capacity ("RFC") assessment, whether the claimant can perform any of his or her past relevant work despite the impairment; and (5) whether there are significant numbers of jobs in the national economy that the claimant can perform given the claimant's RFC, age, education, and work experience." *Winschel*, 631 F.3d at 1178 (11th Cir. 2011) (citing 20 C.F.R. §§ 404.1520(a)(4)(i)-(v); 416.920(a)(4)(i)-(v)).

## THE MEDICAL RECORD

The medical records in this case date back to a September 23, 1987 discharge summary from Central State Hospital. (R. 247). Plaintiff was referred from the Bibb County Mental Health Clinic four days earlier after threatening suicide and being diagnosed with atypical schizophrenia. The discharge summary documented an oral history from Plaintiff's stepmother which included a history of Plaintiff refusing to control his diabetes or take his prescribed mental health medication. Plaintiff self-reported a history of slow thinking, delusions, paranoid ideations, hallucinations, depressed mood, and decreased intellectual capabilities. *Id*. Plaintiff was admitted into inpatient treatment but exhibited no signs of acute psychosis or depression and was diagnosed with impulse control disorder, intermittent explosive disorder, diabetes, and dysthymic disorder. (R. 248 - 49). At discharge, Plaintiff was prescribed triavil and insulin and referred to the Bibb County Mental Health Clinic.

On March, 26, 1990, at the age of 22, Plaintiff was again referred and admitted to inpatient treatment at Central State Hospital. (R. 245). Plaintiff was considered unable to care for his own health and safety and was described by his family as acting "like a mad man went out of control." *Id*. Plaintiff was discharged six days later with instructions to take Humalin, Ritalin, adhere to a 2400 calorie diet, and seek follow up treatment. *Id.*

The next record of treatment is from a Veterans Administration outpatient clinic. The VA records span a period of ten years, comprising approximately 350 pages of treatment records, beginning in 1996 when Plaintiff was twenty nine years old. Progress notes indicate that Plaintiff had a history of uncontrolled diabetes, paranoia, and delusions. (R. 529). Plaintiff was diagnosed with diabetic ketoacidosis and personality disorder and transferred to the ICU. (R. 530). Follow-up notes indicate that Plaintiff's diabetes was difficult to regulate because of Plaintiff's "very haphazard" food intake. (R. 527). By January 1998, as a result of complications with his diabetes, Plaintiff developed "high myopia" and "nonprolipherative retinopathy" of the left eye. (R. 519). Plaintiff sought routine treatment for his diabetes and other minor ailments through 1999. In September, Plaintiff "followed up" for chest pain, apparently having sought treatment at the emergency room months earlier. (R. 505). Testing results were negative.

In early 2000, Plaintiff was prescribed Olanzapine, which improved his reading, although he continued to "present somewhat hyper with pressured speech." (R. 499). In June 2000, Plaintiff was treated for hematemesis. Plaintiff was described as childish and immature with considerable amounts of anger and impulse control issues. (R. 497). Plaintiff was considered to speak "almost in a psychotic manner as he talks of his feeling of tightness in his brain." (R. 497). Plaintiff was referred to a psychologist for diagnosis and appropriate pharmacology. (R. 495).

4

On June 27, 2000, Plaintiff met with Dr. David M. Nichols for specialist treatment of his mental disorder. Dr. Nichols described Plaintiff as quite obsessive, and diagnosed Plaintiff with schizotypal personality and obsessive compulsive personality. (R 595). Olanzapine was increased in dosage. Dosage was again increased the next week after Plaintiff reported improved symptoms, although Plaintiff's counselor noted no improvements. (R. 492).

In September 2000, Plaintiff was again admitted to the ICU for diabetic ketoacidosis, nausea, and vomiting. (R. 466). Plaintiff's blood sugar was 481, his pH was 7.12, and he was started on an insulin drip. (R.448). A surgery consult was ordered due to his "coffee ground vomitus," and an esophagogastroduodenoscopy was ordered for September 21. (R. 448, 438). The procedure revealed a small esophageal hiatus hernia, modest esophagitis, and moderate gastritis. (R. 437). Plaintiff received mental health outpatient treatment on the same day and he reported that his medication was no longer working. Plaintiff "continue[d] to express rather unusual beliefs and perceptions that he has 'lost his mind and can't think properly now for many years.'" (R. 435). Plaintiff had to be constantly reassured by his doctor and exhibited "very poor" concentration. A mental health treatment note from October 23 stated that Plaintiff "has a long history of emotional instability and difficulty concentrating and staying focused. He is subject to intrusive thoughts and often feels a pressure in the back of his head, which he associates with emotional problems." (R. 432). The clinical impression was schizotypal and obsessive compulsive personality features. Two days later Dr. Nichols told Plaintiff that Plaintiff was not employable due to emotional difficulties. (R. 431).

In January 2001, Plaintiff was taken off mental health medication "as multiple medications have thus far been described as questionably beneficial." (R. 439). Plaintiff's counselor indicated in February that Plaintiff exhibited limited understanding, difficulty

5

comprehending, and had difficulty grasping simple concepts. (R. 428). Plaintiff was taken to the emergency room on March 8, 2001, after experiencing chest discomfort. Plaintiff was tachycardic, and an EKG showed "narrow qrs with a rate of 214." (R. 426). After discharge, Plaintiff returned to the VA and was eventually transferred to the Cardiac Care Unit of Atlanta Veteran's Administration hospital. (R. 424). Doctors were unable to find the cause of his tachycardia.

Plaintiff began receiving disability benefits through the VA. In September 2001, his benefits were reassessed as follows: Plaintiff's diabetes, including retinopathy was 60 percent disabling; Plaintiff's neurotic depression, which was previously 30 percent disabling, was 50 percent disabling as of November 2000, and Plaintiff was unemployable as of November 2000. (R. 673). Plaintiff's disability rating for his diabetes was based on regulation of his activities, insulin, and restricted diet combined with episodes of ketoacidosis or hyperglycemic reactions requiring hospitalization. (R. 676). Plaintiff's depression was thirty percent disabling due to occupational and social impairments resulting in reduced reliability and productivity. (R. 677). Due to a likelihood of improvement, the assigned disability rating was not considered permanent. *Id*.

Plaintiff was married in June 2001 and began taking Paroxetine (Paxil) in February 2002. (R. 418). After reporting improved symptoms, the dosage was increased a month later. (R. 415). Plaintiff continued to exhibit excessive ruminations. (R. 399). Plaintiff began complaining of abdominal discomfort in 2003 and symptoms persisted into 2004. (R. 368 – 69). Plaintiff's mental health symptoms continued to improve on Paxil through 2005, although he remained obsessive. (R. 363). Over the next several years, Plaintiff reported improved mental health symptoms and decreased his Paxil dosage to 10 mg daily. (R. 338). In 2009, Plaintiff exhibited

no signs of thought disorder, remained cooperative, and had adequate judgment and insight. (R. 739). He was diagnosed with severe sleep apnea, (R. 721) and kidney stones (R. 733) in 2010. Plaintiff's treatment for his retinopathy reveals that his vision was 20/20 with corrective lenses. (R. 797 – 782). A note from Dr. William H. Jarrard, who treated Plaintiff at Eye Physicians Professional Association for an extended period of time, indicates that Plaintiff has significant nearsightedness, early cortical cataracts not requiring attention, and diabetic retinopathy without evidence of significant macular edema. (R. 793).

Following remand of the ALJ's initial decision to deny benefits, Plaintiff continued to be treated at the VA hospital for diabetes, hypertension, and depression. In January 2010, Plaintiff reported that he felt much more balanced while taking Paxil, but acknowledged needing to repeat things and feeling overwhelmed due to disorganization. (R. 1407). Plaintiff did not believe that he was depressed. (R. 1404). With the exception of dental work, minor injuries, and skin complaints, Plaintiff continued to be treated primarily through routine follow ups through 2014. In late 2011, Plaintiff was treated for left finger trigger and left hand cysts. (R. 1338). He received steroidal injections after symptoms failed to resolve through use of a finger immobilizer. (R. 1271). Plaintiff fractured his 9th right rib in November 2011. (R. 1243). In 2013, Dr. Jarrard stated that Plaintiff's visual acuity remained 20/20 bilaterally with no evidence of diabetic retinopathy. (R. 1233).

In May 2014, Plaintiff was reassessed by the VA for his ability to sustain work related activities. According to Dr. Nichols, Plaintiff had significant difficulties "making occupational, performance and personal-social adjustments," (R. 1575), and determined that he could function satisfactorily in a competitive work setting less than 75% of the time for all areas considered. (R.

1573). In April, Plaintiff reported that he has stopped taking all of his medications and has felt better since doing so. (R. 1609).

## DISABILITY EVALUATION IN THIS CASE

Following the five-step sequential evaluation process, the reviewing ALJ made the following findings in this case. At step one, the ALJ determined that plaintiff had not engaged in substantial gainful activity from March 5, 2000, through his last date insured of December 31, 2005. (R. 824). At step two, the ALJ found that Plaintiff suffered from the following severe impairments through his date last insured: "insulin dependent diabetes mellitus with retinopathy and a mental disorder variously diagnosed as anxiety, depression, paranoid delusional disorder, schizoaffective disorder, obsessive compulsive disorder, and schizotypal personality traits." (R. 824). At step three, the ALJ found that Plaintiff did not have an impairment or combination of impairments meeting or medically equaling the severity of one of the listed impairments through his date last insured. (R. 824). The ALJ assessed Plaintiff's RFC and determined that Plaintiff could perform light work with the following exceptions:

> He should never climb[] ladders, ropes or scaffolds, but he could frequently climb ramps and stairs, and he could frequently balance, stoop, kneel, crouch and crawl; He could have frequent exposure to vibration; he could understand, remember, and carry out simple instructions and he could sustain attention, persistence, and pace for simple repetitive tasks; he could have no more than incidental public contact, and he was able to relate with supervisors and co-workers in a low demand social setting; he would work better with objects rather than people; he needed a stable work setting with infrequent changes; h[e] could not perform work require fast paced production standards or other stressful fast paced work; he may have needed occasionally assistance setting goals and making plans; and consistent with light exertion,, he could lift/carry 20-pounds occasionally and 10-pounds frequently and he could sit, sand, and walk, each, for 6-hours during an 8-hour workday.

(R. 826). At step four, the ALJ determined that Plaintiff was unable to perform any past relevant work through his date last insured. (R. 840). At step five, the ALJ found that through his date last

insured Plaintiff could perform work as a "Laundry Sorter," "Presser," and "Garment folder." (R. 841). Thus, the ALJ determined that Plaintiff was not disabled from March 5, 2000, through December 31, 2005, the date he was last insured. (R. 841).

## ANALYSIS

Relying on the evidence outlined above, Plaintiff seeks to have the decision of the Commissioner either reversed and remanded with instructions to award benefits or remanded for a new hearing. Plaintiff argues that he is entitled to this relief because the ALJ (1) improperly rejected the disability and unemployability ratings from the VA, (2) failed to properly weight the opinion of Plaintiff's treating psychiatrist, Dr. Nichols, and (3) improperly determined that Plaintiff's RFC was nondisabling.

*A. VA Ratings*

Plaintiff first contends that the ALJ's decision is not supported by substantial evidence because the ALJ discredited the disability ratings found by the VA and failed to provide sufficient reasons for doing so. The VA determined that Plaintiff suffered from a combined disability rating of 80% beginning in November 2000. Doc. 9, p. 18. Due to Dr. Nichols' assessment that Plaintiff was unemployable, however, Plaintiff was granted disability compensation at a rate of 100%. Plaintiff asserts that the ALJ "simply dismissed" the employability rating and did not articulate specific reasons for rejecting it. Defendant responds that a VA rating is not binding on an ALJ, and argues that the ALJ properly determined that the VA's disability rating was not supported by the evidence.

The decision of another governmental agency about whether a claimant is "disabled" is based on the rules of that agency and is not binding on the Commissioner. 20 C.F.R. § 404.1504. Nevertheless, the Eleventh Circuit has held that "'[t]he findings of disability by another agency,

although not binding on the [Commissioner], are entitled to great weight.'" *Falcon v. Heckler*, 732 F.2d 827, 831 (11th Cir. 1984) (quoting *Bloodsworth v. Heckler*, 703 F.2d 1233, 1241 (11th Cir. 1983)). An ALJ may make an implicit finding regarding a VA disability rating. *See Kemp v. Astrue*, 308 F. App'x 423, 426 (11th Cir. 2009).

In this case, the ALJ explicitly considered the VA rating and extensively discussed the underlying opinions and medical records upon which it was based. The ALJ observed that the VA assigned a 50% disability rating for mental impairment, but explained that she disagreed with the VA's conclusion that Plaintiff was "'unable to secure or follow substantial gainful occupation' which warranted entitled to individual employability." R. 827. The ALJ noted that, in contrast to the VA, "the Social Security Administration does [not] have provisions relating to 'individual employability'" and does not assign partial disability ratings. R. 827.

The context of the overall decision and the ALJ's extensive discussion of the evidence show that the VA rating was rejected for reasons that are substantial and appropriate. Plaintiff's argument that the ALJ summarily rejected the VA rating is contradicted by the record. The ALJ explicitly stated:

> While VA treatment notes reflect he has credible symptoms and limitations due to his "severe" impairment, these notes do not demonstrate he is "disabled" as that term is used by this Agency. . . . I find that the evidence does not establish the claimant is "disabled" as that term is used by this Agency. Not only does the evidence reflect he is not disabled, the evidence demonstrates he is capable of performing light, simple work, which involves no more than incidental public contact as described in the residual functional capacity herein adjusted.

(R. 827). The ALJ then adequately explained the basis for this conclusion. The VA rating was rejected because the medical record supporting the VA rating is inconsistent with total disability as defined in the Social Security regulations, because Plaintiff exhibited levels of daily

inconsistent with his allegations, and because Plaintiff had a history of only routine treatment once he began taking Paxil.[1]

The ALJ first assessed Plaintiff's levels of daily activity and properly determined that they were inconsistent with total disability. This is an appropriate basis for rejecting opinion based evidence concerning the severity of a Plaintiff's symptoms. *See e.g. Wilson v. Barnhart*, 284 F.3d 1219, 1226 (11th Cir. 2002); *Moore v. Barnhart*, 405 F.3d 1208, 1212 (11th Cir. 2005). As discussed at length in the ALJ's opinion, Plaintiff alleged being unable to complete routine tasks or interact on a basic level with society due to his illnesses. In tension with these allegations, Plaintiff reported being able to care for his dog, which included interaction with society while obtaining services such as routine grooming and medical care. (R. 168). Plaintiff was capable of preparing basic meals for himself, shopping on his own, attending church, and leaving the house Sunday morning, Sunday night, and Wednesday night. (R. 171). Plaintiff was married in June 2011, prior to his successful treatment with Paxil. He is able to pick his wife up from school, although he sometimes forgot to do so (R. 172). Throughout the record, Plaintiff's relationship was described as going well. Plaintiff was able to attend his daughter's graduation in another state and was attempting the purchase a new home with his wife. A function report, filled out in 2009, was completed well after Plaintiff had been treated on Paxil, and he reported being able to follow written and verbal instructions "very well," and to get along with authority figures. (R. 173). Plaintiff and his wife occasionally would go to the movies or a restaurant (R. 238), he attends Braves games, and he self-reported that limited social interaction in the context of his past employment was not a problem. (R 952).

---

[1] Plaintiff argues in his reply brief that these reasons are "post-hoc" and the ALJ did not herself explain them. Doc. 11, p. 3. The ALJ explicitly stated that the evidence does not demonstrate disability because (1) Plaintiff "received mental health treatment rather sporadically," (R. 838) (2) Plaintiff's daily activities do not support a finding of disability, (R. 824, 838, 839 ) (3) most treatment notes only indicate moderate symptoms, and (4) "the record reflects improvement in the claimant's mental symptoms with medication." (R. 839).

The ALJ next considered the medical record and properly determined that the evidence was inconsistent with total disability. As the ALJ recognized, Plaintiff had significant mental health issues beginning in 1987 that required multiple inpatient hospitalizations. Plaintiff was diagnosed with various mental health conditions including schizoaffective disorder, borderline personality, and a history of substance abuse. During this period, Plaintiff was also hospitalized for complications incident to his diabetes, but medical records routinely report that he was noncompliant with his insulin. In late 1999, Plaintiff reported consuming five beers a day and began suffering from chest pain.

In early 2000 Plaintiff began seeing a counselor. By April, Plaintiff reported improved mental health symptoms, which included better concentration and less irritability, but Plaintiff was referred to a psychiatrist after he refused to quit drinking alcohol or comply with a regimen designed to manage his diabetes. The psychiatrist, Dr. Nichols, increased Plaintiff's medication on their initial visit, and noted obsessive behaviors and peculiar thoughts. Plaintiff was cooperative and capable of giving appropriate responses. Plaintiff decided to discontinue his medication, continued to drink, and did not treat his diabetes. (R. 436).

In June 2001 Plaintiff was married. Soon thereafter he returned to therapy and began taking Paxil. Within a few months, Plaintiff reported improved symptoms, although he still exhibited ruminations and was hyper-verbal. He was described as being improved and doing well, and Dr. Nichols noted that the only unusual aspect of his behavior was obsessions concerning medication dosages. From Late 2002 to Plaintiff's date last insured and through the end of the medical record in 2014, Plaintiff exhibited similar symptomatology. In 2003, Plaintiff denied feeling depressed for two consecutive weeks in the past year (R. 386) and was described as motivated and ready to learn. (R. 385). His ability to read and concentrate had improved and

the "empty feeling" in his head had dissipated. (R. 387). In 2004, Dr. Nichols explicitly stated that Plaintiff's depression was well controlled, but he remained hyper-verbal and preoccupied. From 2005 through the end of treatment, Dr. Nichols variously described Plaintiff as cooperative, pleasant, quite verbal, relevant, responding to verbal structure, and Dr. Nichols found no evidence of thought disorder. (R. 363, 370, 375). In 2004, Plaintiff's depression was well controlled. (R. 370). In 2005, Plaintiff reported "substantial benefits" from Paxil, experienced depression less than one day week, (R. 366) and was encouraged to increase his activity level. (R. 363). His depression "remained improved," Plaintiff did not report significant mental health symptoms for the remainder of the record,[2] (R. 267, 294 317 320, 343, 342, 338, 1393, 1337, 1322), and treatment consisted of routine follow up appointments approximately every three to six months. Plaintiff testified at the hearing on remand that Paxil made him "a lot better" (R. 893). At the first hearing, Plaintiff testified that he got along with co-workers "pretty good" and contact with them was not a source of problems. (R.952).[3]

Where, as here, an ALJ fails to explicitly assign weight to a VA rating, but the VA ratings are discussed, the evidence supporting the rating is scrutinized and assigned weight, and the decision is supported by substantial evidence, there is no error. *See e.g. Boyette v. Commissioner of Soc. Sec.*, 605 Fed.Appx. 777 (11th Cir. 2015); *Demp v. Astrue*, 308 F. App'x 423 (11th Cir. 2009); *Adams v. Commissioner of Soc. Sec.*, 542 F. App'x 854 (11th Cir. 2013); *Pelkey v. Barnhart*, 433 F. 3d 575, 579 (8th Cir. 2006) ("[T]he ALJ did not err because he fully considered the evidence underlying the VA's final conclusion."). Based on the forgoing, the ALJ's decision to discredit the VA's disability rating is supported by substantial evidence.

---

[2] Plaintiff occasionally reported being depressed a few days per week.
[3] At the hearing on remand, Plaintiff testified that he was fired for throwing a rag at a coworker.

*B. Dr. Nichols*

The reasons supporting the ALJ's decision to discredit the VA ratings also provide good cause to discredit Dr. Nichols' opinion that Plaintiff was unemployable. "Generally, the opinions of examining or treating physicians are given more weight than non-examining or non-treating physicians unless 'good cause' is shown." *Davisdon v. Astrue*, 370 F. App'x 995 (11th Cir. 2010) (citing 20 C.F.R. § 404.1567 and *Lewis v. Callahan*, 125 F. 3d 1436 , 1440 (11th Cir. 1997)). "Good cause" exists to discredit an examining physician's opinion when it is unsupported by the evidence or inconsistent with the physician's own records. *Id*. Evidence of a claimant performing daily activities inconsistent with a physician's opinion may also be a basis for rejecting that opinion. *Phillips v. Barnhart*, 357 F.3d 1232, 1241 (11th Cir. 2004); *Crow v. Commissioner, Soc. Sec. Admin.*, 571 F. App'x 802, 806 (11th Cir. 2014) (citing *Phillip*s, 357 F.3d at 1241) ("Good cause for giving less weight to a treating physician's opinion exists where evidence supported a contrary finding," and such evidence included testimony about daily activities.).

The ALJ determined that Dr. Nichols' treatment records, the frequency with which Plaintiff sought treatment, and Plaintiff's level of daily activities were inconsistent with Dr. Nichols' opinion that Plaintiff was incapable of employment.[4] These assessments are based upon substantial evidence in the record, and "[o]ur limited review precludes re-weighting the evidence anew." *Moore v. Barnhart*, 405 F. 1208, 1212 (11th Cir. 2005) (internal citations omitted). Where, as here, an ALJ "articulated specific reasons for failing to give a [treating physician's] opinion controlling weight, we find no reversible error." *Id*.

---

[4] Dr. Nichols wrote that "[Plaintiff is felt to be permanently unemployable from an emotional perspective." (R. 430). At the time, his service connected disability related to neurosis was 30%. *Id*.

Plaintiff also asserts that the ALJ failed to discuss "pertinent" elements of Dr. Nichols' opinion. It is not entirely clear what aspects of Dr. Nichols' record Plaintiff contends the ALJ failed to address, but the record reveals that the ALJ considered both those aspects of Dr. Nichols opinion which supported the RFC and those which did not. The ALJ noted that despite Plaintiff's improvement on Paxil, he continued to exhibit ruminations and distractibility throughout his treatments. She further noted Dr. Nichols' opinions concerning Plaintiff's abilities – both the early 2000 opinion and the May 2014 questionnaire. The ALJ's opinion concerning Dr. Nichols is explicit and clearly articulated:

> Although Dr. Nichols had a treating relationship with the claimant, his opinions expressed in his May 2014 letter on the Questionnaire are unsupported by the evidence, including his own objective clinical finding. I also afford little weight to the opinion he expressed in October 2000 when he described the claimant as unemployable from an emotional perspective. Notably, the month before (September 2000), the claimant reported he had stopped taking Zyprexa on his own volition several weeks prior and he did not take any psychotropic medication thereafter until he starting taking Pa[x]il at the end of February 2002. Then, in October 2005 he reported he took Paxil in varying doses and remember his treatment notes reflect that Dr. Nichols reported in May 2009 that he had not seen the claimant since July 2008. Remember, too, Dr. Nichols' notes reflect that other than being somewhat hyper verbal and rather obsessively ruminating about his health, the claimant's mental status after his alleged onset of disability through his date last insured was essentially unremarkable and he was still washing dishes part-time at a local school until he quit in September or October 2000. Moreover, Dr. Nichols noted in March 2004 that the claimant's depression was well controlled, and subsequent notes from other treatment providers reflect the claimant reported he was fine on Paxil and felt "balanced."

(R. 837). These findings of fact are well supported by the record and based upon substantial evidence. They provide good cause to discredit Dr. Nichols' opinion, to the extent that his opinion conflicts with the RFC.[5] The ALJ did not err by affording little weight to Dr. Nichols' opinion on Plaintiff's employability.

---

[5] According to the ALJ it is not entirely clear that Dr. Nichols expressed the opinions Plaintiff attributes to him. Dr. Vanderplate testified at the administrative hearing that these "opinions" are likely recitations of claimant's symptoms rather than based on medical assessments. The 2001 Rating decision attributes the unemployability finding to an examination performed on January 13, 2001. (R. 678). On October 25, 2000, Dr. Nichols wrote "My impression is that he is unemployable from an emotional

C. *Working without Special Accommodations.*

Plaintiff's final argument asserts that the ALJ's RFC precludes Plaintiff from substantial gainful activity because Plaintiff's combined work limitations restrict Plaintiff to "sheltered work, or work requiring accommodations." Plaintiff provides no citations or persuasive support for his conclusion that restrictions of contact with the public and a limited ability to relate to co-workers precludes him from work. Both of these limitations, along with all those in the RFC, were fully accounted for in the hypothetical posed to the vocational expert. (R. 930 - 31) The vocational expert testified these limitations would not preclude someone from substantial gainful activity. It is well established that the testimony of a vocational expert provides substantial evidence on this point when the hypothetical posed to the expert includes all the claimant's impairments. *See Wilson v. Barnhart*, 284 F.3d 1219, 1227 (11th Cir. 2002).

Relying on the vocational expert and the Medical-Vocational guidelines, the ALJ concluded that Plaintiff's limitations do not preclude him from substantial gainful activity. This conclusion is supported by substantial evidence.

## **CONCLUSION**

After a careful review of the record, it is **RECOMMENDED** that the Commissioner's decision be **AFFRIMEDED** pursuant to "sentence four." Pursuant to 28 U.S.C. § 636(b)(1), the parties may serve and file written objections to this Recommendation, or seek an extension of time to file objections, WITHIN FOURTEEN (14) DAYS after being served with a copy thereof. The District Judge shall make a de novo determination of those portions of the Recommendation to which objection is made. All other portions of the Recommendation may be reviewed for clear error.

---

perspective." (R. 180). On November 22, 2000, Dr. Nichols wrote "He is felt to be permanently unemployable from an emotional perspective." (R. 430). The January 13, 2001, exam does not appear to be in the record.

The parties are further notified that, pursuant to Eleventh Circuit Rule 3-1, "[a] party failing to object to a magistrate judge's findings or recommendations contained in a report and recommendation in accordance with the provisions of 28 U.S.C. § 636(b)(1) waives the right to challenge on appeal the district court's order based on unobjected-to factual and legal conclusions if the party was informed of the time period for objecting and the consequences on appeal for failing to object. In the absence of a proper objection, however, the court may review on appeal for plain error if necessary in the interests of justice."

**SO ORDERED**, this 19th day of January, 2017.

s/ Charles H. Weigle_____
Charles H. Weigle
United States Magistrate Judge